Ray MARSHALL, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

WEYERHAEUSER COMPANY, a corporation, Defendant.

Civ. A. No. 77–1866.

United States District Court, D. New Jersey.

Sept. 7, 1978.

---

8. Ford estimates, and GE disputes, the incursion of $32 million of expenses through September 1977.

Manuel Del Valle, New York City, for plaintiff.

Joseph S. Georgiana, Camden, N. J., Douglas B. M. Ehlke, Federal Way, Wash., for defendant.

## OPINION

BROTMAN, District Judge.

### I. *Procedural History*

This action is before the court on application of plaintiff Ray Marshall, Secretary of Labor [hereinafter Secretary], United States Department of Labor, for a search warrant requiring defendant Weyerhaeuser Company of Tacoma, Washington, and any of its officers or agents to permit entry to and inspection of its corrugated box manufacturing plant in Barrington, New Jersey. The warrant is sought pursuant to the Occupational Safety and Health Act of 1970 [hereinafter the Act], 29 U.S.C. § 651 *et seq.,* specifically section 657(a), which provides as follows:

> In order to carry out the purposes of this chapter, the Secretary, upon presenting appropriate credentials to the owner, operator, or agent in charge, is authorized—
>
> (1) to enter without delay and at reasonable times any factory, plant, establishment, construction site, or other area, workplace or environment where work is performed by an employee of an employer; and
>
> (2) to inspect and investigate during regular working hours and at other reasonable times, and within reasonable limits and in a reasonable manner, any such place of employment and all pertinent conditions, structures, machines, apparatus, devices, equipment, and materials therein, and to question privately any such employer, owner, operator, agent or employee.

The matter was brought on for hearing by way of Order to Show Cause which was originally made returnable September 15, 1977. At the request of the parties, the hearing was adjourned until December 2,

1977. Prior to the hearing, Weyerhaeuser moved to dismiss the action. It alleged, *inter alia,* that the court was without subject matter jurisdiction, that the Secretary of Labor was an improper party, that § 657(a) was unconstitutional in allowing warrantless searches of business premises, and that even if section 657 were interpreted to include a warrant provision and hence was constitutional, the Secretary had failed to establish the requisite probable cause needed for the issuance of an administrative search warrant. At the outset of the hearing on December 2, the court confined counsel to the issue of whether probable cause for the issuance of an administrative search warrant existed for an inspection of Weyerhaeuser's Barrington box plant. At the conclusion of the hearing, the court reserved decision.[1]

## II. *Preliminary Considerations*

The court shall deal summarily with many of the contentions of the defendant.[2] Defendant first contends that this court is without jurisdiction to entertain this action because, under 28 U.S.C. §§ 1337 and 1345, there is no federal statute which expressly grants civil action authority to the Secretary of Labor in this instance. Defendant similarly argues that the Secretary of Labor is not the real party in interest under Fed.R.Civ.P. 17(a). While it is not completely clear from the face of the statute what rights were granted to the Secretary by Congress in enacting the Act, the Supreme Court in *Barlow's* concluded that § 657 and the accompanying regulations gave the Secretary the right to proceed in federal court to enforce his prerogative to enter and inspect business premises. *See Barlow's, supra* at 1823 n.12. Jurisdiction is therefore proper under 28 U.S.C. §§ 1345 and 1337 and the Secretary is the real party in interest within the meaning of Rule 17. *See Reynolds Metals Co. v. Secretary of Labor,* 442 F.Supp. 195 (W.D.Va. 1977); *Brennan v. Buckeye Industries, Inc.,* 374 F.Supp. 1350, 1352–53 (S.D.Ga.1974). The defendant also challenges the constitutionality of the inspection procedures employed pursuant to the Act. While this issue was certainly not free from doubt at the time of the hearing, *compare Buckeye Industries, supra,* with *Brennan v. Gibson's Products of Plano, Inc.,* 407 F.Supp. 154 (E.D.Tex.1976), it has been resolved in favor of the statute's constitutionality. Although the holding in *Barlow's* was limited to a declaration that the Act was unconstitutional insofar as it purported to authorize inspections without a warrant or its equivalent, *see* 98 S.Ct. at 1827, it is plain that

1. While the court believed that the Act was constitutional as construed with a warrant requirement (Transcript at 10 [hereinafter Tr.]), it later concluded the better course would be to await the Supreme Court decision in *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978), which was argued shortly after the hearing on December 2 and directly addressed the constitutionality argument. By letter dated April 11, 1978, the parties were so informed. It was also hoped that the case would give further insight into the administrative probable cause issue.

2. Plaintiff commenced this action by the filing of an Order to Show Cause, an affidavit of Health & Safety Compliance Officer William E. Albano, and a memorandum of law. Defendant moved for dismissal of the case on the ground that plaintiff failed to comply with Fed. R.Civ.P. 3 which mandates that all civil actions be commenced by the filing of a complaint. In exchange for the depositions of plaintiff's representatives Albano and Area Director Harry Allendorf, Weyerhaeuser agreed to withdraw its objections based on Rule 3. Plaintiff's technical deficiencies are no doubt caused in part by the hybrid nature of an Order to Show Cause. While the Federal Rules of Civil Procedure do not specifically recognize an Order to Show Cause, federal courts have uniformly acknowledged such a proceeding and treated it similarly to the typical motion but for its preferential place on the court's docket. *See generally* C. Wright and A. Miller, *Federal Practice and Procedure* § 1195; *Rules Governing the United States District Court for the District of New Jersey,* General Rule 12A. Of course, a complaint is normally required to initiate any proceeding, including a hearing to show cause. However, the defendant in this case is clearly on notice as to plaintiff's demand for relief and jurisdictional allegations through the Order, accompanying affidavit and memorandum. Any procedural defect is therefore not itself jurisdictional. *See Schlesinger v. Councilman,* 420 U.S. 738, 742 and n.5, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975); *see also Foman v. Davis,* 371 U.S. 178, 181–82, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).

inspections pursuant to § 657 are authorized once probable cause requirements are met. *Id.* at 1827 n.23.

## III. *Administrative Probable Cause*

With the constitutionality of the Act no longer open to question, the court's attention must focus on the probable cause issue, specifically upon whether the procedures which formed the basis of the August 12, 1977 inspection attempt pass constitutional muster.

### A. *The Facts Surrounding the Attempted Search*

The affidavit of Compliance Safety and Health Officer William Albano, which was the sole evidentiary material filed in support of the Order to Show Cause, provides the starting point of the court's analysis. Albano indicated therein that on the morning of August 12, 1977 he attempted to enter the Weyerhaeuser corrugated box plant in Barrington, New Jersey, but was rebuffed by several Weyerhaeuser officials. In paragraph three of the affidavit, Albano Indicates:

I arrived at the above noted workplace in order to inspect [sic] whether or not there were violations of the Occupational Safety and Health Act of 1970 and the regulations and standards promulgated thereunder. Specifically, I sought to determine if any violations existed including any similar to those found on a prior inspection of January 11, 1974 for which a citation had been issued and corrections undertaken. (A copy is attached hereto as Exhibit 1). Moreover, the Weyerhaeuser Company's Standard Industrial Classification is 2653 which means that it is engaged in the manufacture of corrugated boxes and which is associated with [a] U.S. Department of Labor, Bureau of Labor Statistics occupational injury industrial rate of 19.1 indicating a high hazard industry.

Exhibit 1, referred to in Albano's affidavit, is a notice of citation which outlines the various violations found during the inspection of January 11, 1974. Also included is a sheet outlining the proposed penalties for these various violations.

At the hearing on December 2, plaintiff's counsel summarized the various reasons why an administrative search warrant should be issued under all the circumstances: (1) placement on the "Worst-First" list (Transcript at 7 [hereinafter Tr.]); (2) previous violations occurring in January 1974 at the Barrington facility (Tr. 8); (3) a three year time span between inspections (Tr. 109); (4) classificatory changes in the 1974 Barrington facility violations (Tr. 8); and (5) previous health violations at a Weyerhaeuser-owned truckstop in Cherry Hill, New Jersey. (Tr. 26).

Plaintiff's primary witness at the hearing was Harry D. Allendorf, Area Director for the Camden office of the Occupational Safety and Health Administration (hereinafter OSHA), who is in charge of managing the inspection program within southern New Jersey.[3] Allendorf first attempted to supplement the information which was provided in the affidavit of Officer Albano. He described, in order of priority, four types of inspections undertaken by OSHA: (1) emergency situations arising from employee fatalities or other disasters; (2) employee complaints; (3) National Emphasis Program inspections; and (4) general schedule inspections. The Weyerhaeuser visit was classified as a general schedule inspection based upon OSHA's Inspection Planning Guide (hereinafter IPG). (Tr. 27). The IPG is based upon a computer printout which ranks various commercial establishments according to a statistic known as the hazard rate. The hazard rate is arrived at by relating the injury rate[4] to the average

---

**3.** The jurisdiction of the Camden area office includes the eight southernmost counties in New Jersey comprising over 400,000 employees. (Tr. 64).

**4.** The injury rate, compiled by the Bureau of Labor Statistics through information supplied from state workmen's compensation offices, is equal to the average number of employees in-

number of employees per establishment in a particular standard industrial classification (hereinafter SIC). Essentially, the hazard rate is the rate of injury per average establishment within a given SIC. The IPG groups commercial establishments by SIC and ranks them according to their hazard rate. Each county in the state is analyzed with the most hazardous types of industries listed first. Not every establishment is listed on the IPG. Only those industries and establishments considered relatively hazardous appear; thus the nickname "Worst-First" has been given to the IPG-based inspection program. The corrugated box industry, of which Weyerhaeuser's plant is a part, was ranked 87th out of 141 high hazard industries without southern New Jersey. (Tr. 7).

Area Director Allendorf then attempted to explain the reasons why Weyerhaeuser, as opposed to other IPG-listed establishments, was chosen for inspection by his office. The success of the plaintiff in attempting to fill this void left unanswered in Albano's affidavit was only partial, as the following colloquy between the witness and the court illustrates:

THE COURT: Why in the first place did you pick Weyerhaeuser out of a hat? All of a sudden you are going along in a normal course of business, how did Weyerhaeuser's name come to you?

THE WITNESS: Weyerhaeuser came from our MIS, not the MIS, it's on our Inspection Planning Guide, which lists all the establishments which we consider to be in the high hazard industry.

THE COURT: Why did you pick Weyerhaeuser out of—were there other corrugated operations on that list?

THE WITNESS: Yes, there were, sir.

THE COURT: How many others were on that list?

THE WITNESS: The ones in Camden, I believe there were seven on the list.

THE COURT: Seven from Camden?

THE WITNESS: I believe so, sir.

THE COURT: How about—what else—what other's were there? How about in Cumberland County, Salem County, Gloucester County, Burlington County?

THE WITNESS: Yes, sir, I believe there was a total of about eleven, if I'm not mistaken, a total of eleven.

THE COURT: In your district, a total of eleven?

THE WITNESS: Yes, sir.

THE COURT: You got eleven. Why did you pick Weyerhaeuser?

THE WITNESS: Just that their name was on the list. We already made prior inspections in this category, the 2653 and Weyerhaeuser's name was up near the top.

THE COURT: In other words, give me, if you will, the gradation, you got eleven companies, give me—how did Weyerhaeuser's name come up on the list?

THE WITNESS: All I can give you is that it came up on our individual lists, the SIC list. It's listed by the number of employees. Those with the most number of employees are at the top of the list and those with the least are down at the bottom. So, for example, in Camden, there is one other company in the SIC which indicates that they had more employees than Weyerhaeuser. Weyerhaeuser had the second highest.

THE COURT: Did you pick them out because they have large numbers of employees or are you concerned with the safety within the plant irrespective of the number of employees?

THE WITNESS: Irrespective of the number of employees.

THE COURT: Why did you pick out Weyerhaeuser, sir?

THE WITNESS: It was just one that—we eventually would have gotten around to all of them on there and Weyerhaeuser was the one that we picked out in Camden to do first.

---

jured in a particular standard industrial classification (hereinafter SIC) per one hundred employees. The SIC is a number assigned to each

industrial classification for labor statistic and other purposes. *E. g.*, 2653 is the SIC assigned to the corrugated box industry.

THE COURT: Why did you pick our Weyerhaeuser instead of the one ahead of it?

THE WITNESS: We could have, sir.

THE COURT: In other words, it was like an arbitrary pulling out of a name. Was it that? You could have picked out the last one, the last two, could you not have?

THE WITNESS: Yes, sir.

THE COURT: Why did you really pick out Weyerhaeuser?

THE WITNESS: It was just that we were getting around to all of them on that list, sir. Eventually we would have gotten all of them. So, the one we had to pick, we had to start some place so Weyerhaeuser was picked out to have an inspection performed.

THE COURT: Did you pick them out because you had a previous dealing with them and that stood out in your mind?

THE WITNESS: No, sir.

(Tr. 27–30).

Later during direct examination, Allendorf summarized his reasons for seeking a search warrant after his subordinate was refused entry by Weyerhaeuser officials. His reasons more or less paralleled those put forward by plaintiff's counsel at the commencement of the hearing:

I think I mentioned before it's because there is a relatively high hazard industry. Also from the prior inspections of Weyerhaeuser, one at the Barrington and one at the Cherry Hill, we thought that there was a possibility the conditions, that violations still existed or new violations existed. It has been changing standards. There was a serious violation issued, although we know it was not at the Barrington location. It was at another location in our area.

(Tr. 43).

### B. Discussion of Legal Issues

There is surprisingly little detailed analysis on the subject of what constitutes administrative probable cause for an OSHA inspection. But see Reynolds Metals, supra. The Barlow's Court reiterated the doctrine of administrative probable cause originally set forth in Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) and See v. City of Seattle, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967):

Probable cause in the criminal law sense is not required. For purposes of an administrative search such as this, probable cause justifying the issuance of a warrant may be based not only on specific evidence of an existing violation but also on a showing that "reasonable legislative or administrative standards for conducting an . . . inspection are satisfied with respect to a particular [establishment]." Camara v. Municipal Court, supra, [387 U.S.,] at 538, 87 S.Ct. [1727], at 1736. A warrant showing that a specific business has been chosen for an OSHA search on the basis of a general administrative plan for the enforcement of the Act derived from neutral sources such as, for example, dispersion of employees in various types of industries across a given area, and the desired frequency of searches in any of the lesser divisions of the area, would protect an employer's Fourth Amendment rights. [footnotes omitted].

98 S.Ct. at 1824–25.

The Barlow's Court further explained why it believed such a warrant would be useful:

The authority to make warrantless searches devolves almost unbridled discretion upon executive and administrative officers, particularly those in the field, as to when to search and whom to search. A warrant, by contrast, would provide assurances from a neutral officer that the inspection is reasonable under the Constitution, is authorized by statute, and is pursuant to an administrative plan containing specific neutral criteria.[20]

[20] The application for the inspection order filed by the Secretary in this case represented that "the desired inspection and investigation are contemplated as part of an inspection program designed to assure compliance with the Act and are authorized by Section 8(a) of the Act." The program was not described, however, or any facts presented that would indicate why an inspection of Barlow's establishment was within the program. The order that issued

concluded generally that the inspection authorized was "part of an inspection program designed to assure compliance with the Act."
98 S.Ct. at 1825–26 and n.20; *see id.* at 1831 (Stevens, J., dissenting).

Of the district courts which correctly anticipated the *Barlow's* decision, there is a split of opinion as to what suffices to justify a search. For instance, in *Marshall v. Chromalloy Am. Corp.*, 433 F.Supp. 330, 332 (E.D.Wis.1977), the court held that probable cause was established for searching a particular premises simply by stating in the warrant that the investigation was part of an investigation program designed to assure compliance with the Act and that the attempted inspection was "in the course of a National-Local plan designed to achieve significant reduction in the high incidence of occupational injuries and illnesses found in the metal-working and foundry industry . . . ."; *see also Morris v. Dept. of Labor*, 6 BNA–OSH Cas. 1020 (S.D.Ill.1977). On the other hand, several district courts have taken a more narrow approach. In *Marshall v. Shellcast Corporation*, 5 BNA–OSH Cas. 1689 (N.D.Ala.1977), the court rejected a similar attempt to justify the inspection of a particular establishment simply by showing that it was part of the target iron and steel foundry industry under OSHA's National Emphasis Program. The court concluded that a warrant should issue only if the Secretary presents information concerning the particular accident rate of a particular plant. 5 BNA–OSH Cas. at 1691. In *In re Northwest Airlines, Inc.*, 437 F.Supp. 533, 536 (E.D.Wis.1977), the court rejected an attempt to establish probable cause through the use of an affidavit which simply stated that the requested inspection was part of an overall program. More information was required to inform the judge or magistrate of the reasonableness of the standards and how they applied to a particular establishment. *See also Whittaker Corp. v. OSHA*, 5 BNA–

OSH Cas. 1492 (M.D.Pa., March 7, 1978). Of the district court decisions, however, the most informative and convincing is *Reynolds Metals, supra.* The facts in *Reynolds* closely resemble those before this court. There, a Compliance Safety and Health Officer attempted to inspect a Reynolds facility in Bristol, Virginia, without a warrant. After the company refused, the officer applied to the magistrate for a search warrant. Reynolds then filed suit in the district court seeking to quash the warrant for various inadequacies in the officer's supporting affidavit. The twelve paragraph affidavit provided, *inter alia*, the following information: (1) the proposed inspection was a general schedule inspection and no higher priority inspections were pending; (2) the Reynolds Bristol plant had never been inspected by OSHA; (3) the Bristol plant appeared on the "Worst-First" list (which was explained in the affidavit); (4) the Bristol plant was ranked 20th out of 34 industries on the Roanoke Field Office's "Worst-First" list; and (5) OSHA officers had already inspected the nineteen SICs preceding the 20th ranked metal-can manufacturing industry of which the Bristol facility was a part. Judge Turk evaluated this evidence in light of *Camara* and *See* and concluded that the prior absence of inspection of the Bristol plant, together with what he perceived as a "rational and non-discriminatory" plan of inspection, established probable cause for an inspection warrant. 442 F.Supp. at 200–01. Furthermore, the evidence persuaded him that the plan had not been applied in an arbitrary or discriminatory manner. *Id.*

This court's analysis must center on whether the information produced in either Officer Albano's affidavit or in the aggregate testimony produced at the December 2, 1977 hearing is sufficient to establish administrative probable cause.[5]

---

5. Since the *Barlow's* Court appeared to sanction the use of an ex parte warrant procedure once entry is refused, *see* 98 S.Ct. at 1823–24 and n.15, it is questionable whether future challenges to the probable cause determination will occur prior to the inspection. However, there is no reason to believe that an inadequate or misleading warrant could not later be challenged and the fruits of an illegal search suppressed. *Cf. Franks v. Delaware,* —— U.S. ——, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978); *see also Barlow's supra* 98 S.Ct. at 1820.

### 1. *The Albano Affidavit*

The Secretary argues forcefully that Officer Albano's affidavit satisfied the *Reynolds Metals* and *Barlow's* standard. This argument is unavailing for several reasons. First, as opposed to the detailed description of the "Worst-First" system in *Reynolds,* the Albano affidavit states only that Weyerhaeuser's Barrington plant has a 19.1 occupational injury industrial rate. Aside from an error in terminology,[6] the present affidavit does not even mention the "Worst-First" system or the Inspection Planning Guide. There is no indication of Weyerhaeuser's ranking on the list and there is no explanation of the hazard rate which is the controlling factor with respect to rank. Above all, there is no indication of why Weyerhaeuser, or even Weyerhaeuser's particular SIC group, was being chosen for inspection. In *Reynolds* the affidavit indicated that none of the three other types of priority inspections were pending at that moment. Without comparable information in this affidavit to describe the administrative standards being followed, there can be no meaningful judicial review of the discretion being exercised by OSHA officials. Approval of a search warrant based on this affidavit would amount to a "rubberstamp" such as was impliedly rejected by the *Barlow's* Court. 98 S.Ct. at 1825–26 and n.20 (majority opinion), 1831 (Stevens, J. dissenting); see *Shellcast Corp., supra* at 1691; *Northwest Airlines, supra* at 536.

▉ The Secretary relies heavily on the additional information provided with Albano's affidavit which evidences several violations found during an OSHA inspection of the same Weyerhaeuser facility in January

1974. If this inspection were indeed a followup, a conclusion which a judge or magistrate could easily draw from a fair reading of the affidavit and supporting papers, administrative probable cause would undoubtedly be established even without additional information concerning inspection criteria. *See Camara, supra,* 387 U.S. at 538–39, 87 S.Ct. 1727. However, because of the unusual procedural posture of this case, additional inquiry revealed that the Barrington plant was re-inspected in February 1974, shortly after the initial violations were found. Corrections were completed, no further violations were found, and Weyerhaeuser's safety program was pronounced effective. (Tr. 37). Therefore, the information concerning the 1974 violations does not support probable cause. To hold otherwise would grant OSHA a perpetual right of re-inspection once an initial violation was found. In this court's opinion probable cause requires more.[7]

### 2. *The Aggregate Information Supplied at the Hearing*

As mentioned earlier, the Secretary advanced several additional theories at the December 2 hearing in support of the warrant application. Although not mentioned in the Albano affidavit, the Secretary argues that the prior violations at the Barrington facility are relevant because OSHA changed reporting procedures between 1974 and 1977 so that some of the earlier violations might now be considered serious. However, the court has already intimated that a change in classification is irrelevant to the probable cause determination in view of the fact that the cited violations were

---

**6.** Officer Albano was apparently referring to the hazard rate for the corrugated box industry in New Jersey which is 19.1.

**7.** Because of the inadequacy of the warrant affidavit and the failure to disclose the February 1974 re-inspection of the Barrington plant, defendant urges the court to disregard additional evidence produced at the hearing in support of the warrant. While government misconduct can, in some instances, require suppression of "tainted" evidence, it is only in those cases in which the information provided is shown to be both deliberately false and indis-

pensable to the probable cause determination. *See Franks v. Delaware,* —— U.S. ——, ——, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). While there is a substantial question as to the propriety of the government's conduct in this case, there is no concrete evidence that the omission was deliberate. Moreover, the affidavit does indicate that corrections were undertaken by the defendant. The remaining part of this opinion addresses the question of whether the aggregate information supports administrative probable cause.

corrected and a re-inspection held one month later.

Relying on *Camara v. Municipal Court, supra* at 538, 87 S.Ct. 1727, plaintiff advances the proposition that the mere passage of time between the initial inspection at Barrington and the 1977 attempt justifies a re-inspection and supports probable cause. While there is no doubt that "time alone" may support administrative probable cause in some situations, this case is not appropriate for use of the rule. There is no information either in the warrant or otherwise in the record to support the assertion that the Secretary uses the mere passage of time as a standard for conducting inspections. The passage of time is therefore not a reasonable, discernable administrative standard which is being applied to the Weyerhaeuser plant.

The plaintiff additionally contends that a serious health violation at a four-employee Weyerhaeuser-owned truckstop in Cherry Hill, New Jersey, supports a showing of probable cause for the corrugated box plant in Barrington. This argument is unpalatable primarily because the plaintiff's own "Worst-First" inspection program purposely emphasizes industry groupings, *e. g.*, the SIC, rather than ownership per se as a criterion for determining the priority of inspections.

Although there are various substantive reasons why the plaintiff's arguments do not support probable cause, an equally compelling argument against issuing the warrant is the simple fact that the Area Director himself denied that prior dealings with Weyerhaeuser were a factor in his initial decision to conduct the August 12, 1977 inspection. (Tr. 27–30). Reliance was placed solely on the Inspection Planning Guide. The testimony of the Area Director is consistent with plaintiff's argument that the probable cause analysis consists of two steps, the first being the initial appearance at the Barrington facility, the second being the warrant application after entry is refused.[8] However, the problem with plaintiff's analysis is that it ignores the whole purpose of administrative probable cause which is to ensure neutral application of OSHA inspection procedures to a particular establishment. A selection of a plant or business must be based on neutral criteria *from the outset* to make sure that there is no harassment or subterfuge in the process. Plaintiff's analysis undermines the credibility of reasons which are later presented to a judge or magistrate in support of the warrant. In this case, for example, if the Area Director's testimony is believed, then the affidavit of Officer Albano, which indicates that he specifically sought to check for potential 1974 violations when he first went to Barrington, becomes highly suspect. It is this court's view that similar criteria should motivate an OSHA official both when he initially appears at an establishment and when he comes before a judge or magistrate. The propriety of the warrant must therefore rise or fall on the use of the Inspection Planning Guide.

As far as the use of the IPG or "Worst-First" scheme is concerned, the court concurs with Judge Turk that such is a valid source for isolating target industries and effectuating the Act's purposes. 442 F.Supp. at 200. Additional information is nevertheless required to assure that the procedures, as applied to a particular establishment, are non-arbitrary. In *Reynolds* the court was satisfied that the systematic descent on the "Worst-First" list together with the absence of prior inspections at the Bristol facility, satisfied the fourth amendment. *Id.; cf. Shellcast Corp., supra* at 1691. This case shows none of the necessary safeguards. The Area Director is not working his way systematically down the IPG. (Tr. 66–72). The "Worst-First" program has not been completed and there are many establishments with higher hazard ratings in southern New Jersey which have

---

8. Indeed, the plaintiff's analysis is necessary to reconcile the seeming contradiction in the Area Director's statements that he used only the IPG in his initial decision to inspect Weyerhaeuser but later consulted OSHA's Weyerhaeuser file in an attempt to obtain a warrant. *Compare* Tr. 27–30 with Tr. 43.

not yet been inspected. *Id.* The Barrington corrugated box plant has been inspected not once but twice despite the fact that similarly situated firms in the 2653 SIC have never been visited. Exhibit C–1. In essence, the decision of whom to inspect within the IPG, how many times to inspect, and when to make an inspection lies, at least in the Camden office, exclusively with the Area Director and his subordinates. (Tr. 27–30). There is simply no way for a judicial officer to conclude that the inspection of Weyerhaeuser's plant is being conducted pursuant to "... a general administrative plan ... derived from neutral sources ...." *Barlow's supra,* 98 S.Ct. at 1825. While the IPG is an adequate method of isolating particularly hazardous industries, there is no assurance that the application of this plan to a particular facility is non-discriminatory. *Id.* at 1824; *Camara, supra* 387 U.S. at 538, 87 S.Ct. 1727; *compare Reynolds Metals, supra* at 201.

## IV. *Conclusion*

■ The Secretary's proffered justifications for the August 12, 1977 Weyerhaeuser inspection attempt are not at all persuasive. The evidence produced at the show cause hearing does not indicate exactly how the Barrington plant was initially chosen for inspection. The warrant application is critically defective and, even if the additional reasons produced at the hearing are considered, they do not constitute administrative probable cause. While there is no concrete evidence that plaintiff deliberately withheld relevant facts from Officer Albano's affidavit or that plaintiff is engaged in a pattern of harassment against Weyerhaeuser, the omission of the February 1974 re-inspection is distressing. It emphasizes to this court that evidence must be presented with each warrant application to show that the administrative standards are being applied to a particular establishment in a

neutral manner. This has been required since *Camara* and it continues as a prerequisite under *Barlow's.* Although the court can imagine many schemes which could easily pass fourth amendment scrutiny, it is not the judicial function to prescribe a particular remedy.[9] The proof is in the pudding and the recipe is the responsibility of the Secretary or his designates.

The application for a search warrant is denied and Weyerhaeuser's countermotion to dismiss is granted. The appropriate order shall be entered.

---

9. Several examples immediately come to mind. The Area Director could adopt the same procedure used in *Reynolds Metals.* A system of random numbers assigned to each SIC would also be neutral. The inspection procedure need not be based strictly on the IPG ranking but could involve the number of employees at a particular establishment or other pertinent factors.